Tiffany Troy
TROY LAW, PLLC
41-25 Kissena Boulevard, Suite 110
Flushing, NY 11355
(718) 762-1324
troylaw@troypllc.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

Case No. 24-cv-06917

------------------------------------------------------------------x

SAMANTHA DICOSMO,
*on behalf of herself and others similarly situated,*
                                                    Plaintiff,

                              v.

INSOMNIA COOKIES, LLC,
                                                    Defendant.

------------------------------------------------------------------x

**COLLECTIVE & CLASS ACTION**

**COMPLAINT**

**JURY DEMANDED**

Plaintiff SAMANTHA DICOSMO (hereinafter referred to as "Plaintiff" or "DICOSMO"), on behalf of herself and others similarly situated, by and through her attorneys, Troy Law, PLLC, hereby brings this complaint against Defendant INSOMNIA COOKIES, LLC, (hereinafter referred to as "Defendant" or "INSOMNIA"), and alleges as follows:

## INTRODUCTION

1. This action is brought by the Plaintiff against the Defendant for alleged violations of the Fair Labor Standards Act, (FLSA) 29 U.S.C. §§ 201 *et seq.*, of the Pennsylvania Minimum Wage Act of 1968 ("PMWA"), 43 P.S. §§ 333.101 *et seq.*, and of the Pennsylvania Wage Payment and Collection Law ("WPCL"), 49 P.S. §§ 260.1 *et seq.*, arising from Defendant's various willful and unlawful employment policies, patterns and practices.

2. Defendant has willfully and intentionally committed widespread violations of the FLSA and PMWA by engaging in pattern and practice of failing to pay its employees, including

Plaintiff, for each hour worked, overtime compensation for all hours worked over forty (40) each workweek, and tips earned from customers.

3. Plaintiff alleges, pursuant to the FLSA, that she is entitled to recover from the Defendant: (1) unpaid overtime wages; (2) customer tips retained by Defendant; (3) front pay due to retaliation for protected activity; (4) liquidated damages or prejudgment interest, (5) post-judgement interest; and/or (6) attorney's fees and costs.

4. Plaintiff alleges, pursuant to the PMWA, that she is entitled to recover from the Defendant: (1) unpaid overtime wages; and/or (2) attorney's fees and costs.

5. Plaintiff alleges, pursuant to the PMWA, that she is entitled to recover from the Defendant: (1) customer tips retained by Defendant; (2) liquidated damages; and/or (3) attorney's fees and costs.

## JURISDICTION AND VENUE

6. This Court has original federal question jurisdiction over this controversy under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331, and has supplemental jurisdiction over the PMWA and WPCL claims pursuant to 28 U.S.C. § 1367(a).

7. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b) and (c), because Defendant conducts business in this District, and the acts and omissions giving rise to the claims herein alleged took place in this District.

## PLAINTIFF

8. DICOSMO was employed by INSOMNIA from on or about September 6, 2024 through on or about December 12, 2024.

9. DICOSMO's claims against INSOMNIA for unpaid overtime and withheld tips accrued from on or about September 23, 2024, when she started to work, through on or about December 12, 2024, when she was terminated.

10. DICOSMO's claim against INSOMNIA for retaliation accrued from on or about December 12, 2024, when she was terminated.

## **DEFENDANT**

11. INSOMNIA is a domestic limited liability company organized under the laws of the Commonwealth of Pennsylvania with a principal address at One South Broad Street, Suite 120, Philadelphia, PA 19107 which operates bakeries, party venues, and delivery sites throughout the Commonwealth and throughout the United States.

12. INSOMNIA is an enterprise engaged in interstate commerce that has gross sales in excess of five hundred thousand dollars ($500,000) per year.

13. INSOMNIA purchased, and employees of Defendant including Plaintiff, handled goods moved in interstate commerce.

## **STATEMENT OF FACTS**

14. DICOSMO applied for a "B2B [*i.e.*, business-to-business, wholesale] Sales Specialist" position at INSOMNIA on or about August 12, 2024.

15. INSOMNIA rejected DICOSMO's application on or about August 14, 2024.

16. However, on August 19, 2024, Frank Castano ("CASTANO"), a "Talent Acquisition Coordinator" (*i.e.*, recruiter) invited DICOSMO to apply for an "Events Supervisor" position at INSOMNIA.

17. DICOSMO applied for the "Events Supervisor" position at INSOMNIA on August 20, 2024.

18. DICOSMO interviewed four (4) times for the "Events Supervisor" position, by videoconference: with INSOMNIA's Sales Director Laura Carrol ("CARROL") on August 21, 2024; with INSOMNIA's Northeast Regional Director Craig Ridgell ("RIDGELL") on August 26, 2024; with Bryon Phillips ("PHILLIPS")—the Store Manager for

INSOMNIA's "CookieLab" location, at 833 Wharton Street, Philadelphia, PA 19147—on August 27, 2024; and with INSOMNIA's Strategic Growth Manager Eva Mendez ("MENDEZ") on September 3, 2024.

19. During each of DICOSMO's interviews, DICOSMO was told that she would work hosting customer-booked events (*e.g.*, birthday and other parties) at CookieLab, would not perform hosting work on a regular schedule but would do so on an as-needed basis according to when customers booked events, would be expected to work from home at various clerical tasks that could be performed on a computer when she wasn't hosting events, and would not be expected to work as a manager or to supervise other employees.

20. During each of DICOSMO's interviews, DICOSMO was told that she would receive customer tips from each event she helped to host at CookieLab.

21. INSOMNIA hired DICOSMO on or about September 6, 2024 with the title "Events Supervisor/Store Manager in Training" at CookieLab, at a salary of fifty-six thousand dollars ($56,000.00) per year—despite not having interviewed for or expected to receive a manager position of any sort.

22. Throughout DICOSMO's employment, INSOMNIA misclassified her as a manager in order to deny her overtime and tips.

23. Throughout DICOSMO's employment, CookieLab's hours of operations were from 12:00 PM through 1:00 AM on Mondays through Saturdays; and from 12:00 PM through 12:00 AM on Sundays.

24. On September 17, 2024, before DICOSMO started working, Heather Kennedy ("KENNEDY")—the Operations Manager for INSOMNIA's "Flagship Location" at 1

South Broad Street, Philadelphia, PA 19107—emailed DICOSMO to assign her two (2) weeks of "Store Manager" training at the Flagship Location beginning September 23, 2024.

25. DICOSMO attended "Store Manager" training at the Flagship Location on September 23, 24, 27, and 30, and October 1, 4, and 6, 2024. None of DICOSMO's training related to events supervision.

26. In furtherance of attending the "Store Manager" training at the Flagship Location, DICOSMO spent about one hundred five dollars ($105.00) on parking near the Flagship Location between September 23 and October 6, 2024.

27. On September 29, 2024, while she was training at the Flagship Location, DICOSMO received her first schedule at CookieLab. She was scheduled to work from 6:00 PM through 1:00 AM on October 7, 8, 9, 10, and 11, 2024. DICOSMO raised concerns to her trainer at the Flagship Location about the inapplicability of her training to the tasks she would be expected to perform.

28. On September 30, 2024, DICOSMO met with RIDGELL, CARROL, and MENDEZ at INSOMNIA's headquarters. DICOSMO again raised concerns to RIDGELL, CARROL, and MENDEZ about how it looked—from her being given Store Manager training and from begin scheduled to work on what looked like a regular rather than an as-needed basis—as though she would be expected to work as a Store Manager when she hadn't been hired to do that. RIDGELL reassured DICOSMO that she would be given training more applicable to her work as an Events Supervisor once she started to work.

29. From October 7 through on or about October 13, 2024, PHILLIPS addressed and regarded DICOSMO as his assistant manager.

30. PHILLIPS was terminated on or about October 13, 2024. DICOSMO was informed of PHILLIPS's termination by District Manager Rebecca Young ("YOUNG").

31. On October 13, 2024, PHILLIPS's position was filled, ostensibly on an interim basis, by John Castro ("CASTRO"). CASTRO remained the Store Manager throughout the remainder of DICOSMO's employment.

32. After CASTRO's appointment, DICOSMO learned that INSOMNIA maintained a reimbursement program for expenses that would have covered her parking for training. DICOSMO did not receive reimbursement from this program.

33. Throughout DICOSMO's time at CookieLab, she most usually, and on average, worked about forty-four (44) hours per week including work she was required to perform at CookieLab beyond her scheduled time, work she was required to perform at CookieLab due to last-minute schedule changes, and work she was required to perform for INSOMNIA at home.

34. For example, during the week of November 11–17, 2024, a typical week, DICOSMO worked forty-three hours and fifty-four minutes.

35. However, on occasion DICOSMO worked as many as fifty-two (52), hours per week.

36. DICOSMO kept track of her working hours by clocking in and out using an electronic time clock.

37. However, throughout DICOSMO's employment, PHILLIPS and CASTRO changed DICOSMO's time entries such that she was recorded as having worked only forty (40) hours per week, and YOUNG signed off on these changes.

38. From September 23, 2024 through September 29, 2024, DICOSMO was paid for forty (40) hours per week, at a rate of twenty-six dollars and ninety-two cents ($26.92) per hour—

equivalent to fifty-six thousand dollars ($56,000.00) per year divided by fifty-two (52) weeks per year and further divided by forty (40) hours per week.

39. From September 30, 2024 through December 8, 2024, DICOSMO was always paid for eighty (80) hours per fortnight, at a rate of twenty-six dollars and ninety-two cents ($26.92) per hour—equivalent to fifty-six thousand dollars ($56,000.00) per year divided by fifty-two (52) weeks per year and further divided by forty (40) hours per week.

40. From December 9, 2024 through December 15, 2024, DICOSMO was paid for forty (40) hours per week, at a rate of twenty-six dollars and ninety-two cents ($26.92) per hour—equivalent to fifty-six thousand dollars ($56,000.00) per year divided by fifty-two (52) weeks per year and further divided by forty (40) hours per week.

41. During DICOSMO's employment by INSOMNIA, customers tipped DICOSMO in the following amounts for the following weeks:

   a. October 14–20, 2024: thirty-two dollars and forty cents ($32.40);

   b. October 28–November 3, 2024: three hundred sixty-six dollars and eighty-five cents ($366.85);

   c. November 4–10, 2024: ninety-three dollars and twenty-four cents ($93.24);

   d. November 11–17, 2024: one hundred forty-one dollars and twelve cents ($141.12);

   e. November 18–24, 2024: two hundred fifty-six dollars and fifty cents ($256.50);

   f. November 25–December 1, 2024: twenty-six dollars and ten cents ($26.10); and

   g. December 2–8, 2024: one hundred forty-five dollars and forty-four cents.

42. Throughout DICOSMO's employment by INSOMNIA, INSOMNIA retained and did not distribute to DICOSMO the tips that she had earned.

43. At various times between October 14, 2024 and October 28, 2024, DICOSMO complained to YOUNG that her being denied her tips was unlawful. YOUNG invariably responded that she would raise the issue to CAROLL.

44. On October 29, 2024, DICOSMO met with CARROL, among other representatives of INSOMNIA, to complain that she had never agreed to be classified as a manager, and that she was being denied her tips unlawfully. DICOSMO was given a vague assurance that her complaints would be addressed.

45. On November 6, 2024, at YOUNG's prompting, DICOSMO enrolled in INSOMNIA's dental and vision benefits program.

46. On November 11, 2024, YOUNG emailed DICOSMO a job description for an Assistant General Manager, despite that being neither the role DICOSMO had interviewed for, nor the job title she had been assigned, nor descriptive of the job she was actually doing, nor a job she wanted.

47. By December 5, 2024, DICOSMO noticed that she was not accruing sick days and vacation days.

48. On December 5, 2024, DICOSMO met with RIDGELL by telephone to complain: that she had never agreed to be classified as a manager; that the time shaving and tip retention she had experienced were unlawful; and about her benefit non-accrual.

49. RIDGELL told DICOSMO that she was a manager, that he would look into her pay and fix any anomalies, that CARROL was responsible for making sure she received her tips, and that she would need to address her complaints about benefits to INSOMNIA's human resources department (the "People Team").

50. On December 5, 2024, DICOSMO emailed the People Team to complain about not accruing sick days and vacation days.

51. On December 9, 2024, INSOMNIA's benefits company told DICOSMO that she had never been enrolled in its benefits program, and that she would need to contact the People Team to enroll.

52. Also on December 9, 2024, DICOSMO verbally complained to CASTRO: that the time shaving and tip retention she had experienced were unlawful; and about her benefit non-accrual. DICOSMO was calm and professional in raising her complaints, but CASTRO gave DICOSMO a verbal warning and writeup for using "profane language."

53. Also on December 9, 2024, DICOSMO was composing an email to INSOMNIA's payroll department, the People Team, RIDGELL, CASTRO, and YOUNG complaining: that she had never agreed to be classified as a manager; that the time shaving and tip retention she had experienced were unlawful; and about her benefit non-accrual, when YOUNG called her and ordered her not to send the email to INSOMNIA's payroll department, the People Team, RIDGELL, or CASTRO, but only to send it to her (YOUNG).

54. On December 11, 2024, RIDGELL emailed DICOSMO saying that she should call the benefits company (which she already had—they had directed her to contact the People Team).

55. RIDGELL also called DICOSMO to tell her that: her role at CookieLab was to be a manager; as a manager she should have received a bonus which she never did; CAROLL was still figuring out the tip issue; and her pay loss was due to her withdrawing money from an Ultimate Kronos Group ("UKG") wallet[1] before her payday.

---

[1] Upon information and belief, a UKG wallet allows participating employees to access a portion of their earned wages before they are paid, which can be deducted from their next paycheck.

56. At no point had DICOSMO signed up for a UKG wallet or withdrawn money from it. At no point during her employment by INSOMNIA did DICOSMO know how to use a UKG wallet.

57. Later on December 11, 2024, on a videoconference with, among others, CASTRO, DICOSMO complained to CASTRO that she had never agreed to be classified as a manager; that the time shaving and tip retention she had experienced were unlawful; and about her benefit non-accrual.

58. DICOSMO asked CASTRO to speak to CAROLL about her tips, since RIDGELL had repeatedly suggested that resolving the tip issue was CAROLL's responsibility, but CASTRO refused, saying that "Laura [CAROLL] doesn't speak to anyone below general managers."

59. After being given the runaround for months, DICOSMO finally lost her composure. CASTRO joined YOUNG into the call, and YOUNG called DICOSMO "unprofessional" and terminated her effective December 12, 2024.

60. DICOSMO objected to YOUNG that firing her for complaining about unlawfully being denied overtime and tips was itself unlawful, but YOUNG was not dissuaded.

61. Following her termination from INSOMNIA, DICOSMO applied for unemployment insurance benefits. INSOMNIA took steps to ensure that DICOSMO would be denied unemployment insurance benefits, including representing to Pennsylvania's Unemployment Compensation System that DICOSMO was not entitled to unemployment insurance benefits. As of this writing, DICOSMO has neither received unemployment insurance benefits nor been able to obtain new employment.

62. INSOMNIA willfully and maliciously terminated, and took other and further adverse action, against DICOSMO for opposing conduct she reasonably believed to be unlawful under the Fair Labor Standards Act, and which YOUNG, CASTRO, and other representatives of INSOMNIA knew or should have known she was opposing as unlawful under the Fair Labor Standards Act.

63. At no point during DICOSMO's employment by INSOMNIA did she customarily or regularly supervise the work of two (2) or more other employees.

64. At no point during DICOSMO's employment by INSOMNIA did she have, or exercise, the power to hire, promote, reward, terminate, demote, or discipline other employees.

65. At no point during DICOSMO's employment by INSOMNIA did she have the authority to recommend to INSOMNIA's management that other employees be hired, promoted, rewarded, terminated, demoted, or disciplined.

66. At no point during DICOSMO's employment by INSOMNIA did she recommend to INSOMNIA's management that other employees be hired, promoted, rewarded, terminated, demoted, or disciplined; accordingly, at no point were such recommendations by DICOSMO given particular weight.

67. At no point during DICOSMO's employment by INSOMNIA was she substantially free from supervision herself, being always under the supervision of either PHILLIPS or CASTRO, and YOUNG.

68. INSOMNIA willfully and maliciously misclassified DICOSMO, and shaved her recorded working time, in order to deny her overtime wages and tips she had earned as an Events Supervisor.

## COLLECTIVE ALLEGATIONS

69. Plaintiff brings her FLSA claims for unpaid overtime and retained tips individually and on behalf of all other and former non-exempt employees who have been or were employed by the Defendant for up to the last three (3) years, through entry of judgment in this case (the "Collective").

## CLASS ALLEGATIONS

70. Plaintiff brings her PMWA and WPCL claims pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") Rule 23, on behalf of all non-exempt personnel employed by Defendant on or after the date that is two years before the filing of the Complaint in this case, including Plaintiff (the "Class").

71. The Class members are readily ascertainable. The number and identity of the Class members are determinable from the records of Defendant. The hours assigned and worked, the positions held, and the rate of pay for each Class Member is also determinable from Defendant's records. For purpose of notice and other purposes related to this action, their names and addresses are readily available from Defendant. Notice can be provided by means permissible under said Fed. R. Civ. P. 23.

### *Numerosity*

72. The proposed Class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, and the facts on which the calculation of the number is presently within the sole control of the Defendant, upon information and belief, there are more than forty (40) members of the class.

*Commonality*

73. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

    a.  Whether Defendant employed Plaintiff and the other Class members within the meaning of the PMWA;

    b.  Whether Plaintiff and the other Class members worked more than forty hours per week;

    c.  Whether Plaintiff's and the other Class members' working time was recorded accurately or was subject to time-shaving;

    d.  Whether Plaintiff and the other Class members who worked more than forty hours per week were entitled to one and one-half times their regular wage rates for hours worked beyond the fortieth hour per week;

    e.  Whether Plaintiff and the other Class members who worked more than forty hours per week were paid one and one-half times their regular wage rates for hours worked beyond the fortieth hour per week;

    f.  Whether Defendant received and withheld any portion of Plaintiff's and the other Class members' tips given by customers; and

    g.  At what common rate, or rates subject to common method of calculation was and is Defendant required to pay the Class members for their work.

*Typicality*

74. Plaintiff's claims are typical of those claims which could be alleged by any member of the Class, and the relief sought is typical of the relief that would be sought by each member of the Class in separate actions. All the Class members were subject to the same corporate practices of Defendant, as alleged herein, of failing to pay overtime, time

shaving, and tip retention. Defendant's corporate-wide policies and practices affected all Class members similarly, and Defendant benefitted from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

*Adequacy*

75. Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in representing plaintiffs in both class action and wage-and-hour employment litigation cases.

*Superiority*

76. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage-and-hour litigation where individual Class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of efforts and expenses that numerous individual actions engender. Because the losses, injuries and damages suffered by each of the individual Class members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class members to redress the wrongs done to them. Further, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the

claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendant and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

77. Upon information and belief, Defendant and other employers throughout the state violate the PMWA and WPCL. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the complaint a degree of anonymity which allows for the vindication of their rights while eliminating or reducing these risks.

## STATEMENT OF CLAIMS

### Count I.
### [Violation of FLSA—Failure to Pay Overtime
### Brought on behalf of the Plaintiff and the Collective]

78. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

79. Section 207(a)(1) of the FLSA provides that "[e]xcept as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer

than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

80. Despite Defendant's conclusory classification, Plaintiff was not exempt from the requirement of Section 207(a)(1) of the FLSA pursuant to Section 213(a)(1).

81. Plaintiff's primary duty was not management of Defendant's enterprise or any recognized subdivision thereof.

82. Plaintiff's primary duty was hosting events booked by customers at Defendant's premises.

83. At no point during Plaintiff's employment by Defendant did she customarily or regularly supervise the work of two (2) or more other employees.

84. At no point during Plaintiff's employment by Defendant did she have, or exercise, the power to hire, promote, reward, terminate, demote, or discipline other employees.

85. At no point during Plaintiff's employment by Defendant did she have the authority to recommend to Defendant's management that other employees be hired, promoted, rewarded, terminated, demoted, or disciplined.

86. At no point during Plaintiff's employment by Defendant did she recommend to Defendant's management that other employees be hired, promoted, rewarded, terminated, demoted, or disciplined; accordingly, at no point were such recommendations by Plaintiff given particular weight.

87. At no point during Plaintiff's employment by Defendant was she substantially free from supervision herself.

88. Beginning September 23, 2024, Plaintiff typically worked forty-four (44) hours per week.

89. Throughout Plaintiff's employment, beginning September 23, 2024, Defendant's agents edited Plaintiff's recorded time to forge false records that showed Plaintiff working fewer hours than she worked, and fewer than forty (40) hours per week.

90. Throughout Plaintiff's employment, beginning September 23, 2024, Defendant paid Plaintiff for forty hours per week regardless of the number of hours she actually worked.

91. Throughout Plaintiff's employment, beginning September 23, 2024, Defendant failed to pay Plaintiff for her overtime hours, at one and one-half her regular hourly rate or otherwise.

92. Section 216(b) of the FLSA provides that "[a]ny employer who violates the provisions of… section 207 of this title shall be liable to the employee or employees affected in the amount of… their unpaid overtime compensation,… and in an additional equal amount as liquidated damages.… The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

93. Defendant knowingly, willfully, and maliciously disregarded the provisions of the FLSA by shaving Plaintiff's time and by not paying her for overtime hours (at one and one-half times her regular wage rate or otherwise), when they knew or should have known such was due and that failing to do so would financially injure Plaintiff.

**Count II.**
**[Violation of PMWA—Failure to Pay Overtime**
**Brought on behalf of the Plaintiff and the Class]**

94. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

95. Section 333.104(c) of the PMWA provides that "[e]mployees shall be paid for overtime not less than one and one-half times the employe's regular rate as prescribed in regulations promulgated by the secretary…."

96. Beginning September 23, 2024, Plaintiff typically worked forty-four (44) hours per week.

97. Throughout Plaintiff's employment, beginning September 23, 2024, Defendant's agents edited Plaintiff's recorded time to forge false records that showed Plaintiff working fewer hours than she worked, and fewer than forty (40) hours per week.

98. Throughout Plaintiff's employment, beginning September 23, 2024, Defendant paid Plaintiff for forty hours per week regardless of the number of hours she actually worked.

99. Throughout Plaintiff's employment, beginning September 23, 2024, Defendant failed to pay Plaintiff for her overtime hours, at one and one-half her regular hourly rate or otherwise.

100.    Section 333.113 of the PWMA provides that "[i]f any employe is paid by his or her employer less than the minimum wages provided by section 4 of this act or by any regulation issued thereunder, such worker may recover in a civil action the full amount of such minimum wage less any amount actually paid to the worker by the employer, together with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between the employer and the worker to work for less than such minimum wage shall be no defense to such action."

101.    Defendant knowingly, willfully, and maliciously disregarded the provisions of the PWMA by shaving Plaintiff's time and by not paying her for overtime hours (at one and one-half times her regular wage rate or otherwise), when they knew or should have known such was due and that failing to do so would financially injure Plaintiff.

### Count III.
### [Violation of FLSA—Tip Retention
### Brought on behalf of the Plaintiff and the Collective]

102.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

103.    Section 203(m)(2)(B) of the FLSA provides that "[a]n employer may not keep tips received by its employees for any purposes…."

104.    Defendant was not entitled to retain Plaintiff's tips on the theory that she was a "manager[] or supervisor[]…."

105.    Plaintiff's primary duty was not management of Defendant's enterprise or any recognized subdivision thereof.

106.    Plaintiff's primary duty was hosting events booked by customers at Defendant's premises.

107.    At no point during Plaintiff's employment by Defendant did she customarily or regularly supervise the work of two (2) or more other employees.

108.    At no point during Plaintiff's employment by Defendant did she have, or exercise, the power to hire, promote, reward, terminate, demote, or discipline other employees.

109.    At no point during Plaintiff's employment by Defendant did she have the authority to recommend to Defendant's management that other employees be hired, promoted, rewarded, terminated, demoted, or disciplined.

110.    At no point during Plaintiff's employment by Defendant did she recommend to Defendant's management that other employees be hired, promoted, rewarded, terminated, demoted, or disciplined; accordingly, at no point were such recommendations by Plaintiff given particular weight.

111.    At no point during Plaintiff's employment by Defendant was she substantially free from supervision herself.

112.    Section 216(b) of the FLSA provides that "[a]ny employer who violates section 203(m)(2)(B) of this title shall be liable to the employee or employees affected in the

amount of… all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated damages."

113.    Defendants knowingly, willfully, and maliciously disregarded the provisions of the FLSA by retaining Plaintiff's tips, when they knew or should have known such was due and that failing to do so would financially injure Plaintiff.

## Count IV.
### [Violation of WPCL—Tip Retention
### Brought on behalf of the Plaintiff and the Class]

114.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

115.    The WPCL provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages.

116.    Plaintiff and Defendant formed an employment contract on the mutual understanding that Plaintiff would earn and receive tips.

117.    Throughout her employment, representatives or agents of Defendant authorized to bind Defendant repeatedly promised Plaintiff that she would receive her earned tips.

118.    Despite the foregoing, Defendants failed to release Plaintiff's earned tips to her throughout her employment and through the present.

119.    Section 260.9a of the WPCL provides that "any employee or group of employees… may institute actions provided under this act[;]" that "[a]ctions by an employer… to recover unpaid wages and liquidated damages may be maintained in any court of competent jurisdiction, by… any one or more employes for and in behalf of himself or themselves and other employes similarly situated[;]" and that "[t]he court in any action brought under this section shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow costs for reasonable attorneys' fees of any nature to be paid by the defendant."

120.     Section 260.10 of the WPCL provides that "[w]here wages remain unpaid for thirty days beyond the regularly scheduled payday… and no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employe shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($ 500), whichever is greater."

121.     Defendant knowingly, willfully, and maliciously disregarded the provisions of the FLSA by retaining Plaintiff's tips, when they knew or should have known such was due and that failing to do so would financially injure Plaintiff.

**Count V.**
**[Violation of FLSA—Retaliation for Protected Activity**
**Brought on behalf of the Plaintiff]**

122.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

123.     Section 215(a) of the FLSA provides that it is "unlawful for any person… (3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

124.     Defendant terminated Plaintiff, and prevented Plaintiff from obtaining unemployment insurance benefits, in retaliation for objecting to Defendant's policies of time shaving, overtime non-payment, misclassification, and tip retention as unlawful.

125.     Section 216(b) of the FLSA provides that "[a]ny employer who violates the provisions of section 215(a)(3)… of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3)… of this title,

including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages."

126.        Defendant knowingly, willfully, and retaliated against Plaintiff for protected activity.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself, and on the behalf of the Collective and Class, respectfully requests that this Court enter a judgment providing the following relief:

a. At the earliest practicable time giving notice of this collective action, or authorizing Plaintiff to give notice of this collective action, to all persons who are presently, or have up through the extent allowable under the statute of limitations and including the date of the notice's issuance, been employed by Defendant. Such notice shall inform such employees that this lawsuit has been filed, of the nature of this lawsuit, and of their right to join this lawsuit if they believe they are owed overtime or tips;

b. A declaratory judgment that the practices complained of herein are unlawful under FLSA, PMWA, and WPCL;

c. An injunction against Defendant, its owners, officers, agents, successors, employees, representatives, and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices and policies set forth herein;

d. An award of unpaid overtime, and liquidated damages equal to unpaid overtime, due to Plaintiff and the Collective under the FLSA;

e. An award of unpaid overtime due to Plaintiff under PMWA;

f. An award of withheld tips, and liquidated damages equal to withheld tips, due to Plaintiff under the FLSA;

g. An award of withheld tips, and liquidated damages, due to Plaintiff under the WPCL;

h.  An award of Plaintiff's lost wages, and liquidated damages equal to lost wages, as a remedy

    for retaliation under the FLSA;

i.  An award of reasonable attorneys' fees and costs; and

j.  Any such other and further legal or equitable relief as the Court may deem necessary, just,

    and proper.

Dated: Flushing, NY
       December 31, 2024January 2, 2025

TROY LAW, PLLC
*Attorneys for Plaintiff*

 /s/ Tiffany Troy                               
Tiffany Troy, Esq.
41-25 Kissena Boulevard
Suite 110
Flushing, NY 11355
(718) 762-1324
troylaw@troypllc.com